| | | |
|---|---|---|
| TIMOTHY SARVIS<br>9904 Berliner Place, Apartment B<br>Middle River, MD 21220 | * | IN THE |
| | * | |
| Plaintiff | * | CIRCUIT COURT |
| | * | FOR |
| vs. | * | BALTIMORE CITY |
| METABOLIFE INTERNATIONAL, INC.,<br>5643 Copley Drive<br>San Diego, California 92111<br>Serve On: CT Corporation<br>818 West Seventh Street<br>Los Angeles, CA 90017 | * | CASE NO. 24-C-05-006984 or |
| AND | * | |
| THE CHEMINS COMPANY, INC.<br>Serve On: Dorothy Coulter<br>1835 E. Cheyenne Road<br>Colorado Springs, CO 80906 | * | |
| AND | * | |
| ALPINE HEALTH PRODUCTS, LLC<br>1525 W. Business Park Drive<br>Orem, Utah 84058<br>Serve On: CT Corporation System<br>50 West Broadway, 8th Floor<br>Salt Lake City, UT 84101 | * | |
| AND | * | |
| RITE AID CORPORATION<br>Serve On: Martin Grass, President<br>30 Hunter Lane<br>Camp Hill, PA 17011 | * | |
| Defendants | * | |

* * * * * * * * * * * *

## COMPLAINT

The Plaintiff, Timothy Sarvis, by Dennis F. O'Brien, P.A. and Foard, Gisriel, O'Brien & Ward, LLC, and Kevin D. Wise, Esquire and The Law Office of Kowitz, Wise & St. Laurent, his



attorneys, sues the Defendants Metabolife International, Inc., The Chemins Company, Inc., Alpine Health Products, LLC, and Rite Aid Corporation, and say:

## I. PARTIES

### A. PLAINTIFFS

1. Plaintiff, Timothy Sarvis (hereinafter "Plaintiff"), is a citizen of Baltimore, Maryland.

2. Plaintiff purchased and ingested the ephedra-containing product Metabolife 356 in Baltimore City, Maryland. Metabolife 356 is manufactured by Metabolife International, Inc., The Chemins Company, Inc., and Alpine Health Products, LLC. He purchased this product exclusively at Rite Aid Corporation drugstores.

3. On or about July 29, 2002, while using Metabolife 356, the Plaintiff suffered from atrial fibrillation (AF), requiring hospital treatment and which resulted in permanent damage to his heart and cardiovascular system.

### B. DEFENDANTS

4. Defendant, Metabolife International, Inc. is a California corporation whose principal place of business is located at 5643 Copley Drive, San Diego, California.

5. Defendant, The Chemins Company, Inc. is a Colorado corporation whose principal place of business is located at 1835 E. Cheyenne Road, Colorado Springs, Colorado.

6. Defendant, Alpine Health Products, LLC, is a Utah business entity whose principal place of business is located at 1525 W. Business Park Drive, Orem, Utah.

7. At all relevant times, Defendants did research, develop, manufacture, create, design, test, label, package, distribute, supply, market, sell, promote, and/or advertise ephedra-containing dietary products in the United States, specifically Metabolife 356.

8. Defendant, Rite Aid Corporation is a Pennsylvania corporation whose principal place of business is located at 30 Hunter Lane, Camp Hill, Pennsylvania.

9. At all relevant times, Rite Aid Corporation, owned and operated retail stores, which sold dietary supplements, including Metabolife 356, to the public.

10. Rite Aid Corporation, in disregard of the warnings implicit and explicit in the overwhelming body of literature, continued to sell to the public the product Metabolife 356. The warnings, at all times relevant to this action, were available to Rite Aid Corporation stores, as well as Rite Aid Corporation management.

## II. PARTIES

### A. FACTUAL BACKGROUND

11. In 4000 B.C., Ma Huang (Ephedra), a Chinese herb, was used as a cold remedy, usually ingested in tea made from the ephedra plant for persons suffering shot-term inflammation of the lungs due to common cold and asthma problems. Ma Huang was usually recommended for short-term use.

12. Ephedra sinica, also known as Ma Huang, Mormon Tea, and now on the streets as Herbal Ecstasy, is the plant most commonly used as a source of ephedra. Ma Huang is a popular dietary supplement across the world and has been used in Chinese medicine for over 5,000 years.

13. Ephedra naturally occurs in several different species of botanical plants. Ephedra contains "ephedrine alkaloids," which are naturally occurring chemical stimulants. Ephedrine, pseudoephedrine, methylephedrine, norephedrine, and norpseudoephedrine are all different types of ephedrine alkaloids. Although the proportions of the different types of ephedrine alkaloids in botanical plants vary from one plant species to another, the most common ephedrine alkaloids that are present in ephedra are ephedrine and pseudoephedrine. Norephedrine is an ephedrine alkaloid also known as phenylpropanolamine, which was recently banned by the Food & Drug Administration (hereinafter "FDA").

14. The synthetic form of ephedrine is considered to be a drug and is heavily regulated by the FDA, while the natural form of ephedrine that is present in ephedra is considered to be a dietary supplement and therefore is not heavily regulated by the FDA under the Dietary Supplement Health & Education Act of 1994. Both ephedrine and ephedra are known to stimulate the sympathetic nervous system and cause vasoconstriction of the blood vessels. They also dilate bronchial tubes, elevate blood pressure, and increase heart rate.

3

## B. WRONGFUL CONDUCT

15. Pursuant to Dietary Supplement Health & Education Act of 1994, manufacturers of dietary supplements are responsible to ensure the safety and integrity of their products, specifically ephedra-containing products, such as Metabolife 356.

16. The Defendants engaged in a diverse and wide-sweeping marketing and over-promotion to sell their ephedra-containing product. The Defendants misinformed and misled Plaintiff and consumers about their ephedra-containing dietary product, and failed to protect Plaintiff and users from serious dangers, which Defendants knew or should have known resulted from the use of their ephedra-containing dietary product.

17. The Defendants' promotions included, but were not limited to, claims that their ephedra-containing dietary product would allow Plaintiff to stimulate fat loss, preserve lean muscle mass, increase energy, and increase metabolism.

## C. CHRONOLOGY

18. In 1994, ephedra-containing dietary supplements were sold over the counter worldwide, with little oversight by the FDA.

19. In August 2002, the Justice Department began conducting criminal investigations into the safety and effects of ephedra-containing dietary supplements.

20. In May 2003, Illinois became the first state to ban the use of ephedra-containing dietary supplements.

21. In October and November 2003, ephedra-containing dietary supplements were banned in California and New York, respectively.

22. Finally, on December 30, 2003, the FDA announced a nationwide ban of the herbal weight-loss supplement ephedra as a result of concerns of its serious and adverse effects on health.

23. On April 12, 2004, the FDA ban became effective making sales of ephedra-containing diet supplements illegal.

### D. SERIOUS AND ADVERSE EFFECTS OF EPHEDRA

24. Ephedra-containing dietary products have been strongly associated with substantial increases in blood pressure, heart rate, and arrhythmia.

25. Ephedra-containing dietary products cause other amphetamine-like effects such as nervousness, hyperactivity, increased energy, anxiety, increased insomnia, tremor, dry mouth and a "speedy" feeling.

26. Ephedra-containing dietary products are potent central nervous system stimulants and vasoconstrictors that cause adverse health risks, including death, intracranial hemorrhage, hypertension, palpitations, tachycardia, arrhythmias, dysrhythmias, myocardial infarctions, seizures, tremors, psychosis, nervousness, headaches, syncope, vertigo, strokes, and gastrointestinal distress.

27. Defendants have failed to formulate, manufacture, design, and compound their product, so as not to constitute an unreasonable risk of death, intracranial hemorrhage, heart attack, seizure, stroke, and psychosis.

28. Defendants have failed to properly test the purity, quality, quantity, uniformity, potency, absorption, bioavailability, distribution, metabolic mechanisms, elimination rates, pharmacodynamics and pharmacogenetics of their ephedra-containing dietary products.

29. The warning label for the ephedra-containing dietary product did not adequately warn of the inherent dangers and risks of ephedra-containing dietary products, and failed to warn with an intensity commensurate with the existing danger. The warning was inadequate because it failed to warn Plaintiff and over the counter consumers of the risks of death, intracranial hemorrhage, heart attack, arrhythmias, stroke, seizure and psychosis.

30. The Product Warning labels were inadequate for failure to warn of additive, synergistic, or potentiated effects of ephedra when combined with sympathomimetic medications or foods.

5

### III. CLAIMS FOR RELIEF

#### COUNT I
#### STRICT LIABILITY PURSUANT TO §402A
#### OF THE RESTATEMENT OF TORTS (SECOND)

31. Plaintiff repeats and realleges, as if more fully set forth herein, each and every allegation contained in the above paragraphs, and further alleges:

32. Defendants are liable to Plaintiff pursuant to §402A of the Restatement of Torts (Second) or similar state law in that:

   a. The Defendants were and are engaged in the business of manufacturing, promoting, marketing, advertising, distributing, supplying and selling the ephedra-containing dietary product Metabolife 356, which Defendants sold and distributed in the State of Maryland to Plaintiff.

   b. The Plaintiff was using Metabolife 356 in a manner for which it was intended or in a reasonably foreseeable manner.

   c. The Defendants' Metabolife 356 was expected to and did reach the Plaintiff and similarly situated consumers without substantial change in its condition as manufactured and sold by the Defendants.

   d. The Defendants knew or should have known that the foreseeable risks associated with Metabolife 356 manufactured and distributed by the Defendants exceeded the benefits of that good.

   e. The Plaintiff was not aware of, and could not have reasonably discovered the dangerous nature of Metabolife 356.

   f. Metabolife 356, manufactured and distributed by the Defendants, caused or subjected the Plaintiff to suffer atrial fibrillation (AF) upon consumption and therefore constitutes a product unreasonably dangerous for normal use due to its defective design, defective manufacture and the Defendants' misrepresentations and inadequate facts disclosed to the Plaintiff.

   g. As a direct and proximate result of the Defendants' design, manufacture, promotion, and sale of Metabolife 356:

6

    i. Plaintiff suffered serious and grievous personal injuries;

    ii. Plaintiff incurred economic loss, including loss of earnings and loss of earning capacity; and

    iii. Plaintiff was required to expend fair and reasonable expenses for necessary health care, attention and services.

h. The Defendants, therefore are strictly liable to the Plaintiff.

33. As a direct and proximate result of the Defendants' conduct, the Plaintiff suffered atrial fibrillation (AF), was hospitalized, was caused to be placed in fear for his life, his cardiovascular system, including his heart, was damaged, he was disabled, and lost time from his employment and usual pursuits, all without any negligence on his part contributing.

WHEREFORE, the Plaintiff claims Two Million Dollars ($2,000,000.00).

## COUNT II
### NEGLIGENCE

34. Plaintiff repeats and realleges, as if more fully set forth herein, each and every allegation contained in the above paragraphs, and further alleges:

35. It was the duty of the Defendants to use reasonable care in the manufacture, promotion, marketing, advertising, distribution and sale of Metabolife 356.

36. Contrary to their duty, the Defendants were and are guilty of one or more of the following careless and negligent acts and/or omissions, in that they:

    a. Failed to adequately and properly test and inspect Metabolife 356 so as to ascertain whether or not it was safe and proper for the purpose for which it was designed, manufactured, and sold;

    b. Failed to utilize and/or implement a reasonably safe design in the manufacture of Metabolife 356;

    c. Failed to manufacture Metabolife 356 in a reasonable and safe condition for which it was intended;

    d. Failed to adequately and properly warn the Plaintiff and others similarly purchasing Metabolife 356 of the risk of adverse side effects when used in a manner for which it was intended;

    e. Failed to adequately and properly label Metabolife 356, so as to warn the Plaintiff of the risk of adverse side effects;

    f. Manufactured Metabolife 356, which constitute a hazard to health;

    g. Manufactured Metabolife, which caused adverse side effects; and

    h. Were otherwise careless and negligent.

37. As a direct and proximate result of one or more of the foregoing unsafe and defective conditions of the Defendants' product, the Plaintiff suffered sever injuries, as more particularly described above, all without any negligence on his part contributing.

WHEREFORE, the Plaintiff claims Two Million Dollars ($2,000,000.00).

### COUNT IIK
### BREACH OF EXPRESS WARRANTY

38. Plaintiff repeats and realleges, as if more fully set forth herein, each and every allegation contained in the above paragraphs, and further alleges:

39. Defendants expressly warranted to the Plaintiff, by and through statements made by the Defendants or the Defendants' authorized agents or sales representatives, orally and in publications, and on bottles of the product and in other written materials, that Metabolife 356, which the Defendants manufactures, promoted, marketed, advertised, distributed and sold to the Plaintiff, was of merchantable quality, fit and safe for human use and otherwise not injurious to Plaintiff's health and well-being.

40. Plaintiff, in reasonable reliance upon Defendants' guarantees and express warranties, purchased and used Metabolife 356.

41. The Metabolife 356 consumed by the Plaintiff and others similarly situated was unsafe, unmerchantable, unfit for human use and otherwise injurious to the Plaintiff, notwithstanding the Defendants' guarantees and express warranties.

8

42. The Defendants breached their express warranties in that Metabolife 356 was not of merchantable quality, was not fit and safe for human use, and was injurious to the Plaintiff's health and well-being.

43. As a direct and proximate result of one or more of the foregoing unsafe and defective conditions of the Defendants' product, the Plaintiff sustained severe injuries, as more particularly described above, all without any negligence on his part contributing.

WHEREFORE, the Plaintiff claims Two Million Dollars ($2,000,000.00).

### *Count IV*
### *Breach of Implied Warranty*

44. Plaintiff repeats and realleges, as if more fully set forth herein, each and every allegation contained in the above paragraphs, and further alleges:

45. Defendants impliedly warranted to the Plaintiff and others similarly situated that Metabolife 356 was of merchantable quality, fit and safe for human use and otherwise not injurious to the Plaintiff's health and well-being.

46. Plaintiff in reasonable reliance upon Defendants' guarantees and implied warranties, purchased and used Metabolife 356.

47. The Metabolife 356 consumed by Plaintiff and others similarly situated was unsafe, unmerchantable, unfit for human use and otherwise injurious to the Plaintiff, not withstanding the Defendants' guarantees and implied warranties.

48. The Defendants breached their implied warranties that Metabolife 356 was not of merchantable quality, was not fit and safe for human use, and was injurious to the Plaintiff's health and well-being.

49. As a direct and proximate result of one or more of the foregoing unsafe and defective conditions of the Defendants' product, the Plaintiff sustained severe injuries, as more particularly described above, all without any negligence on his part contributing.

WHEREFORE, the Plaintiff claims Two Million Dollars ($2,000,000.00).

_____
Dennis F. O'Brien, P.A.
Foard, Gisriel, O'Brien & Ward, LLC
29 W. Susquehanna Avenue
Suite 302
Towson, Maryland 21204
(410) 296-1440


_____
Kevin D. Wise, Esquire
Law Office of Kowitz, Wise & St. Laurent
2 North Charles Street
Suite 330
Baltimore, Maryland 21201
(410) 752-7094
*Attorneys for Plaintiff*